IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Criminal Action No. 23-cr-00222-GPG

UNITED STATES OF AMERICA,

    Plaintiff,

v.

(2) JONATHAN ARVAY,

    Defendant.

---

## ORDER

---

Before the Court is Defendant Arvay's Motion to Suppress Evidence from Search of Player One Arcade (D. 115) (the Motion to Suppress). For the reasons set forth below, the Court DENIES the Motion to Suppress.

## I. INTRODUCTION

On February 18, 2022, U.S. Magistrate Judge Scott T. Varholak authorized a search warrant for Player One Arcade, located at 2864 Colorado Boulevard, Denver, Colorado (D. 115-1). The Player One warrant was one among a bundle of warrants issued around the same time and based on the same investigation and a common extensive application and affidavit (*see* D. 115-2). In support of his motion, Defendant Arvay asserts that: (1) there was no probable cause to support issuing the warrant (because (a) fewer than five persons were conducting the business of Player One as is necessary for a federal gambling law violation, (b) the business was not in operation for

1

more than 30 days, and (c) the business did not violate state law); (2) the warrant fails to link Player One to the overarching Sugar Arcade; (3) the warrant was lacking in probable cause for most of the items seized; and (4) law enforcement seized items not authorized by the warrant.

## II.  FACTS[1]

The Government asserts that Nathan Sugar and his confederates ran an illegal gambling business.  They did this by opening numerous gambling dens where customers could play various versions of a fish game, which entails shooting at a fish on a computer screen.  Wagers were placed using a proprietary cryptocurrency termed "ODAC" that could be purchased and sold at the different dens.  The dens were linked through common use of the ODAC cryptocurrency as well as through management and ownership.

## III.  LEGAL STANDARD

The Fourth Amendment provides that "no warrant shall issue, but upon probable cause, supported by oath and affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  If a search violates the Fourth Amendment, an exclusionary rule typically requires that the evidence obtained as a result of that search be suppressed.  *Nix v. Williams*, 467 U.S. 431, 440–42 (1984). As a general matter, if the challenged search or seizure was conducted pursuant to a warrant, the defendant has the burden of proof to demonstrate that it violated the Fourth Amendment.  *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993).

---

[1] The Court draws the operative facts from the Application for a Search Warrant (D. 115-2).  The initial factual recitation is meant to provide a brief overview, due to the complexity of the alleged conspiracy.  The Court will later address specific facts as they relate to the supposed deficiencies Defendant Arvay identified.

A court "review[ing] the sufficiency of the affidavit upon which a warrant is issued" is tasked with "simply ensuring 'that the magistrate had a substantial basis for concluding that probable cause existed.'" *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)). Such "[p]robable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Gates*, 462 U.S. at 238). Probable cause requires a nexus between the suspected criminal activity and the place to be searched. *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009). Or put differently, the task of the judge in evaluating a warrant application and affidavit is to make a practical, common-sense decision as to whether the facts and circumstances within the affiant's knowledge, based on reasonably trustworthy information, are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed. *United States v. Armendariz*, 922 F.2d 602, 608 (10th Cir. 1990). In reviewing a duly-issued warrant, a court "accord[s] a . . . judge's probable-cause finding 'great deference.'" *Id.* at 1281. Because the Fourth Amendment exhibits a "strong preference for warrants," a reviewing court must "resolve 'doubtful or marginal cases' by deferring to a magistrate judge's determination of probable cause," *id.* at 1282 (quoting *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984)).

## IV. ANALYSIS

The Affidavit in Support (D. 115-2) submitted by the Government asserts violations of various statutes including 18 U.S.C. §§ 1955–1957, 1960, and 31 U.S.C. § 5363. As Defendant Arvay bears the burden of proving a Fourth Amendment violation, *see Maestas*, 2 F.3d at 1491, I

focus only on those statutory sections for which Defendant Arvay specifically asserts a lack of probable cause.

### A. Five-or-More-Persons Requirement

18 U.S.C. § 1955(ii) includes the involvement of "five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business" as an element of the crime. Defendant Arvay asserts that "[t]he affidavit only describes three persons: Arvay, Speer and an unidentified clerk." This is not accurate. Defendant Arvay's argument completely ignores the alleged combined nature of the conspiracy. The Government's affidavit describes what is commonly termed a spoke-and-hub operation. That is, a hub that has a common nexus of individuals, and various spokes for different aspects of the crime or conspiracy. This structure is not uncommon in business organizations, both legitimate and criminal. The true issue is not whether the Government can attempt to proceed under the theory that this was a hub and spoke operation. Indeed, on-point caselaw, not distinguished or cited by Defendant Arvay but referenced by the Government, supports the proposition that a spoke-and-hub theory can satisfy the five-or-more persons requirement in exactly this circumstance—a gambling operation consisting of different spokes with each spoke having less than the requisite five individuals but sufficiently combined through the hub. *See U.S. v. Grey*, 56 F.3d 1219, 1221 (10th Cir. 1995). Accordingly, the issue is whether the Government has sufficiently alleged and shown probable cause to believe that such an operation was occurring in this instance.

While Defendant Arvay does not specifically challenge, or even mention, the need to determine whether the various spokes are sufficiently connected to the hub, in the Court's view this issue merits some discussion. The various dens all offered some version of the fish game upon

which bets could be placed (D. 115-2 at SW_00003769).[2]  The various associated dens also all utilized the proprietary ODAC crypto currency (*id*. at SW_00003774).  Payouts could occur only through ODAC (*id*).  The Government determined that the use of ODAC was unique to the Sugar Arcades (*id*. at SW_00003776).

Further, the Government connected the different dens back to Sugar or other common associates through financial transactions (*id*. at SW_00003776-82, SW_00003820).[3]  From December 1, 2020 to July 31, 2021, the various Sugar Arcade dens transferred at least $1.9 million from various accounts at Security Service Federal Credit Union (SSFCU) to other accounts at SSFCU in the name of Crypto Arcades or Obsidian Innovations (*id*. at SW_00003776).  Those accounts transferred at least $1.4 million to Nathan Sugar (*id*).  Adam Speer is an authorized signatory on multiple accounts related to the Sugar Arcade conspiracy; account documents also reflect that he is the CFO of various entities in the conspiracy (*id*. at SW_00003780).  Further, Speer is one of two authorized signatories for the Player One account at SSFCU (*id*. at SW_00003782).  Speer is also listed as Player One's registered agent. (*id*.).  Documents from the Colorado Secretary of State shows that Arvay formed Player One (*id*. at SW_00003820).  Arvay is Player One's corporate officer, and Speer its agent (*id*.).  Player One began depositing into SSFCU on June 30, 2021.

---

[2] The Court can discern, from the ECF filing caption, that the affidavit is filed at D. 115-2.  Unfortunately, the document header overlaps an older ECF number with the new filing number, making it difficult to use the pagination applied through the ECF system.  However, the document also includes Bates numbers, e.g., "SW_00003769," which the Court references in this Order for the sake of clarity.

[3] The Court takes judicial notice of the affidavit and application (D. 115-2).  While only certain portions of the extensive document are expressly cited, the Court considered these documents in their entirety.

The actual number of individuals involved includes five or more persons who conduct, finance, manage, supervise, direct, or own all or part of the overarching business. The Government sets forth the involvement of five discreet individuals, not including Defendant Arvay, meeting the aforementioned definition—a list of those individuals is set forth in a chart (*id*. at SW_00003761-62) and their involvement is documented in the application and affidavit.

### B. Thirty-Day Operating and Revenue Requirements

Under 18 U.S.C. § 1955(iii), a gambling business is only an "illegal gambling business" if it "has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." Defendant Arvay asserts that there is no proof that as to this element because "a few customer reviews on a website does not fulfill this requirement" (D. 115 at 8). Defendant also argues that there is nothing to establish gross revenue for Player One (*id*.).

But again, this is a spoke-and-hub case, and this prong must also be viewed collectively in the context of the overarching gambling operation. *See Grey*, 56 F.3d at 1221. Viewed through that lens, the combined business was in operation for well more than thirty days—starting operations no later than late 2020. It would be nonsensical to interpret this element to permit defendants charged under the statute to structure their business (and defeat the statute's effect) by creating pop-up gambling establishments, e.g., individual gaming entities that would operate for 29 days, then closing those establishments and opening others. Similarly, gross revenue must be viewed cumulatively. Over the 242 days between December 1, 2020, and July 31, 2021, the various arcades transferred $1.9 million to SSFCU accounts. $1.9 million divided by 242 equals

6

$7,851. Thus, on at least some day in that time span, gross revenues necessarily exceeded $2,000 (and likely did so on many days).

Even if the conspiracy's other constituent entities (aside from Player One) could be disregarded, Player One itself still satisfies 18 U.S.C. § 1955(iii)'s requirements—Player One began depositing funds in SSFCU approximately eight months before the warrant was issued and had approximately four months of customer reviews (*id*. at SW_00003820). The disjunctive nature of the statute does not require both alternatives to be met, so proof that Player One had a gross revenue of $2,000 for at least one day is not needed.

### C. State Law Violations

Pursuant to 18 U.S.C. § 1955(i), a business is only an "illegal gambling business" if it "is a violation of the law of a State or political subdivision in which it is conducted." Defendant Arvay argues that fish game tables are legal and can be purchased on the internet, that the affidavit does not state how the four tables at Player One "fit the definition of a gambling machine under Colorado law," and that the affidavit fails to show the illegality of the Player One tables "when the undercover officers were there" (D. 115 at 8).

The application and affidavit accurately set forth the relevant portions of Colorado state law from C.R.S. Articles 10 and 10.5 (D. 115-2 at SW_00003764-67) which, for purposes of brevity, I incorporate herein by reference rather than repeat wholesale. Defendant Arvay argues that a fish game can legally be bought on the internet and used legally. That an item—whether it be it a deck of cards or an electronic fish game—may be legally possessed is not the end of the analysis. The relevant statutory definitions cumulatively impose the need to show that a device,

7

which might otherwise be legal to possess, own, or use, was used for or intended to be used for gambling.

In relevant part, C.R.S. § 18-10-102(3) defines a gambling device as "any device, machine, paraphernalia, or equipment that is used or usable in the playing phases of any professional gambling activity." C.R.S. § 18-10-102(2) defines gambling to mean "risking any money [or] credit . . . upon . . . the operation of a gambling device." Defendant Arvay's bare-bones assertions on this issue are entirely unhelpful to the Court in determining where exactly Defendant Arvay believes the affidavit was deficient. The motion states that the affidavit "does not describe how these four tables fit the definition of a gambling table under Colorado Law" (D. 115 at 8). But the affidavit describes, in detail, just that (*see* D. 115-2 at SW_00003768 ¶ 28, SW_00003770 ¶ 35, SW_00003771 ¶ 37, SW_00003772 ¶ 38). Those paragraphs explain how individuals purchased credits, played the game, and, possibly, won cash prizes—that is gambling under Colorado law. The affidavit adequately and fully describes how the fish tables meet the definition of gambling machines.

Turning next to Defendant Arvay's assertion that "[t]he affidavit fail[s] to establish the illegality of the tables in Player One when the undercover officers were there" (D. 115 at 8), this argument is similarly unavailing and at odds with the text of the affidavit. First, the Court is not convinced that there is a requirement for undercover officers to physically see or be present when actual illegal gaming is occurring to meet the probable cause standard. Hypothetically, proof of a common scheme, design, and plan could be proven without observing gambling in each den. Setting aside that possibility, the affidavit documents the FBI undercover operation in which two undercover operatives went to Player One, saw the fish tables, saw customers playing, took

pictures of customers playing, played themselves, documented that money was loaded on cards to play, and documented the redemption process (D. 115-2 at SW_00003820-23). The illegal use of the tables occurred while the officers were present.

### D. Links Between Player One and the Overarching Sugar Arcade Conspiracy

As set forth above, the application and affidavit sufficiently link Player One to the overarching Sugar Arcade conspiracy.

### E. Probable Cause for Seizures

Defendant Arvey flatly asserts that "there was no probable cause to suspect that Player One was involved in money laundering or unlawful money transmitting" and that there "were no grounds to seize" a laundry list of items set forth in the motion (D. 115 at 9). The Court does not find that this sufficiently addresses or raises the issue. Indeed, "perfunctory and cursory reference[s] without citation to authority in support of a legal argument is inadequate to warrant consideration." *U.S. v. Almaraz*, 306 F.3d 1031, 1041 (10th Cir. 2002).

The affidavit discusses and defines money laundering pursuant to 18 U.S.C. §§ 1956 and 1957. The activities outlined related to the receipt, deposit, and movement of funds through the SSFCU accounts and then on to Nathan Sugar sufficiently establish probable cause for money laundering. As set forth above, Player One was directly implicated because it started making SSFCU deposits. To the extent that Defendant Arvay believes the list of items and places to be searched was overly expansive because probable case was not established for money laundering, such probable cause was established by the affidavit—and very fully and extensively so.

As noted by Defendant Arvay in his motion (D. 115 at 6), there must be a nexus between the contraband and the place to be searched. There is a nexus when the "affidavit describes

9

circumstances which would warrant a person or reasonable caution in the belief that the articles sought are in a particular place." *United States v. Knox*, 883 F.3d 1262, 1277 (10th Cir. 2018). Other than the unavailing argument that no probable cause existed for money laundering, Defendant does not expound on his no-nexus theory. The Court has fully reviewed the list of items and places authorized for search and seizure (D. 115-1 at SW_00003852–55). The Court, keeping in mind the remainder of the extensive affidavit, has specifically reviewed the "Basis" section of the request (D. 115-2 at SW_00003838–47). That section fully sets forth circumstances warranting the inference that the evidence of the crimes sought could reasonably be found in the various places authorized for search. There is no nexus issue.

### F.  Seizures Outside the Scope of the Warrant

Finally, Defendant Arvay argues that certain items were seized despite the fact that the warrant did not authorize those seizures (D. 115 at 9). Defendant Arvay references Exhibit C, the list of items seized, and states that the list includes "tax documents, W-2 and W-4 forms, four motherboards, four controllers, and two Apple iPhones, three computers, a Clover point of sale, a DVR, and like items" (*id*. at 9-10). But he does not identify what (if any) of those items law enforcement officers were not authorized to seize—and the warrant specifically authorizes the seizure of such things as "tax returns," "instrumentalities of gambling," "Forms . . . W-4," and "computers" (*see* D. 115-1 at SW_00003852–53). It is not clear to the Court what items or items Defendant Arvay thinks fell outside of the warrant's scope and the Court declines to guess. Defendant Arvay had the opportunity to make a particularized argument about seizures outside the warrant's scope, but he did not do so. Accordingly, the Court does not find any item to have been seized beyond the warrant's authorization.

### G. Good Faith

Based on the foregoing analysis, the Court need not reach the issue of whether the good-faith exception to the exclusionary rule applies. However, even assuming the warrant and the affidavit were deficient, the Court would nonetheless find that the good-faith doctrine applies.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922–923 (1984)). Thus, a defendant can only challenge the warrant when it is "obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* (citation omitted). The Supreme Court has found that the "shield of immunity" otherwise conferred by a warrant will be lost "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (internal quotations and citation omitted).

The Court finds that law enforcement acted in good faith reliance on a search warrant signed by a magistrate judge. The Court explained in detail above the reasons why the supporting affidavit contains abundant information upon which the magistrate judge relied in concluding that the probable cause supported the warrant. The Court need not repeat that analysis here. The Tenth Circuit teaches that the magistrate judge's determination "is entitled to credence." *See United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985). And this is not a case where the affidavit was "so lacking in indicia of probable cause" that no reasonable officer would have believed probable cause existed.

## V.  CONCLUSION

Accordingly, Defendant Arvay's Motion to Suppress is DENIED.

DATED July 31, 2024.

BY THE COURT:

Gordon P. Gallagher
United States District Judge

12